COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-467-CR

 

 

ROBERT
JONATHAN BIGLER                                                 APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 362ND
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 








Appellant Robert Jonathan Bigler appeals his
conviction for murder.  In seven points,
he contends that the trial court improperly overruled his motion to suppress,
that the evidence is legally and factually insufficient to support the verdict,
and that the trial court abused its discretion by admitting expert testimony
and prejudicial evidence.  We affirm.

Dawn Sellers and Arthur Garcia, appellant=s
co-defendant at trial, were dating during the spring of 2003.  Appellant was Arthur=s friend
at the time.  During the course of Dawn
and Arthur=s relationship, Bobby Chernay,
the victim, began to harass Dawn by repeatedly coming to her house late at night
while intoxicated.

On July 2, 2003, Dawn, Arthur, and appellant were
attending a pool party at the apartment complex of Dawn=s
brother, Erik, when Dawn overheard appellant tell Arthur, ALet=s go
talk to [Chernay] to tell him to leaveCstop
harassing [Dawn] . . . . [D]on=t be a
pussy.@  Appellant continued to Aegg[] on@ Arthur
the entire evening.

Early the next morning, Arthur and appellant took
Dawn home in Arthur=s car and then left
together.  When they returned to Dawn=s house
about an hour later, Dawn noticed that both men had blood on their clothes,
that Garcia=s knuckles were swollen and
bruised, and that he had a bump on his head and a bite mark on his arm.  Dawn also noticed that appellant had a red
mark on his side when he took off his shirt.








Around 11:00 a.m. the same morning, Chernay=s
roommate found Chernay lying on the floor in his bedroom.  He checked Chernay=s pulse,
felt nothing, and then called the police. 
By the time the paramedics arrived, Chernay was dead.

Detective David Taylor of the Carrollton Police
Department performed a death investigation. 
When he arrived at the scene, Chernay was lying just inside the doorway
into the bedroom wearing only a white T-shirt. 
There was blood spatter on and beside the bed, a large amount of broken
glass in the room from bottles or windows, some guitar stands that had been
knocked over or broken in pieces, a broken guitar on the floor by Chernay, and
a hat, some shirts, and some other bedding thrown on the floor.  Among the items found at the scene were
appellant=s hat and Arthur=s shoes
with Chernay=s blood on them.

Appellant was indicted for the capital murder of
Chernay, and he pleaded not guilty.  A
jury found him guilty of murder, a lesser-included offense, and assessed his
punishment at life imprisonment.








In his first two points, appellant contends that
the trial court erred by denying his motion to suppress evidenceCspecifically,
blood and hair samples obtained as a result of a warrantCbecause
the warrant does not, on its face, describe the place, persons, or things to be
searched or seized with the particularity required by the Fourth Amendment.[2]








We review a trial court=s ruling
on a motion to suppress evidence under a bifurcated standard of review.[3]  In reviewing the trial court=s
decision, we do not engage in our own factual review.[4]  The trial judge is the sole trier of fact and
judge of the credibility of the witnesses and the weight to be given their
testimony.[5]  Therefore, we give almost total deference to
the trial court=s rulings on (1) questions of
historical fact and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.[6]  But when the trial court=s
rulings do not turn on the credibility and demeanor of the witnesses, we review
de novo a trial court=s rulings on mixed questions of
law and fact.[7]

When reviewing a trial court=s ruling
on a mixed question of law and fact, we may review de novo the trial court=s
application of the law of search and seizure to the facts of the case.[8]  When there are no explicit findings of
historical fact, the evidence must be viewed in the light most favorable to the
trial court=s ruling.[9]  We must uphold the trial court=s ruling
if it is supported by the record and correct under any theory of law applicable
to the case even if the trial court gave the wrong reason for its ruling.[10]  There is a strong preference for searches
authorized by warrant, and we should interpret them in a commonsensical, rather
than a hypertechnical, manner.[11]








The two objectives of the law covering search
warrants are to ensure there is adequate probable cause to search and to
prevent a mistaken execution of the warrant against an innocent third party.[12]  These objectives are not furthered by a rigid
application of the rules concerning search warrants.[13]  Technical discrepancies in the descriptive
portions of a search warrant will not automatically void the warrant.[14]  Moreover, Aa court
may construe a warrant with reference to a supporting application or affidavit
if the warrant uses appropriate words of incorporation, and if the supporting
document accompanies the warrant.@[15]








In assessing the sufficiency of an affidavit for
a search warrant, we are limited to the four corners of the affidavit.[16]  We must interpret the affidavit in a common
sense and realistic manner, recognizing that the magistrate was permitted to
draw reasonable inferences.[17]

The requirement that a warrant particularly
describe the place to be searched and the persons or things to be seized
advances the constitutional objectives of 
(1) ensuring that the officer searches the right place; (2) confirming
that probable cause is in fact established for the place described in the
warrant; (3) limiting the officer=s
discretion and narrowing the scope of the search; (4) minimizing the danger of
mistakenly searching the person or property of an innocent bystander; and (5)
informing the owner of the officer=s
authority to search that specific location.[18]  AObedience
to the particularity requirement both in drafting and executing a search
warrant is therefore essential to protect against the centuries-old fear of
general searches and seizures.@[19]  Thus, when a warrant and its supporting
documents contain accurate and specific directions that meet these
constitutional objectives, the particularity requirements of the Fourth
Amendment are satisfied.[20]








In this case, the search warrant uses words of
incorporation, and an affidavit accompanied the warrant.  The warrant, in pertinent part, states,

[T]he Affiant . . . did .
. . swear to said Affidavit before me (which . . . is by this reference
incorporated herein for all purposes),

 

. . . .

 

[Y]ou are commanded to enter the suspected place,
premises, and vehicle described in said Affidavit and to there search for the
personal property and evidence described in said Affidavit and to seize and
view the same and bring it before me.

In addition, the affidavit accompanying the search warrant states,

1.  There is in Denton County, Texas, a person
described and located as follows: 
Defendant, Robert Jonathan Bigler, a white male, Date of Birth
11/27/1979, located within the Denton County Jail.

 

2.  There is at said place a person with evidence
described as follows: a representative sample of head hair with attached roots
for comparison and constituting DNA evidence. 
Blood and/or saliva constituting DNA evidence.

 

3.  Said person has evidence controlled by each
of the following persons:  Robert
Jonathan Bigler.

 

. . . . 

 

On July 25, 2003 Robert
Bigler was arrested at Intercontinental Airport, Houston, Harris County,
Texas.  Bigler=s belongings which
included a duffle bag containing clothing were logged into his property.

 








Your Affiant knows that
it is possible, through such scientific tests, to extract DNA from cellular
material, that is unique to an individual, much like that of a
fingerprint.  Your affiant further knows
that the hairs collected from the defendant, Robert Jonathan Bigler, may be
compared, through scientific analysis, to evidence collected from 2210 Benbrook
Dr., Carrollton, Denton County, Texas.

 

Wherefore, Affiant asks for issuance of a warrant
that will authorize him to collect the listed evidence from Robert Jonathan
Bigler and seize the same.

The relevant facts that can be gleaned from
reviewing both the warrant and the affidavit are that a person named Robert
Jonathan Bigler, with the birth date of November 27, 1979, was located in the
Denton County Jail and that he was in control of DNA evidence consisting of Ahead
hair with attached roots,@ blood, and saliva.  These descriptions are specific enough to
ensure that the officers would search the right person and place; that there is
probable cause to search the person and place in question; that the officers=
discretion would be limited; that there is no danger that the wrong person or
place would be searched mistakenly; and that the officers had authority to
search the person and place.[21]  Therefore, we hold that the trial court properly
denied appellant=s motion to suppress, and we
overrule appellant=s first and second points.








In his third and fourth points, appellant asserts
that the evidence is legally and factually insufficient to support the jury=s
verdict because the State failed to meet its burden of proving appellant=s intent
or proving that appellant caused Chernay=s
death.  Appellant contends that the
overwhelming weight of the evidence proves that Chernay=s death
was either an accident or that another person murdered him using a stun gun.

The evidence shows that the evening before the
murder, appellant was heard encouraging Arthur to go over to Chernay=s house
to confront him.  Appellant was angry
about the situation between Dawn and Chernay and kept Aegging
on@ Arthur
to confront him.

On the night of the murder, appellant and Arthur
dropped Dawn off at her house, left in Arthur=s car,
and returned to Dawn=s home approximately an hour
later.  Arthur had swollen, bruised
knuckles, a bump on his head, and a bite mark on his arm; appellant had a red
mark on his side.  Appellant=s hat
and Arthur=s bloodied shoes placed both
Arthur and appellant at the scene of the crime.








Detective Gary Fernandez, the lead investigator
in this case, testified that the blood on Arthur=s shoes
was significant because it showed that pools of blood were already on the floor
as Arthur walked through them.  He also
stated that he believed that the severe beating to Chernay=s body
was evidence of an intent to kill because Ait goes
to a point of almost being overkill.  He
was beaten everywhere on his body, about his head, about the side of his body
with a hard, rigid object.  It was not
just fists . . . there was weapons used.@

Detective Taylor noted the large amount of
Chernay=s blood
found on the scene: Chernay=s
T-shirt was saturated with blood in the area near his stab wound; there was a
large area of blood on and beside the bed, which looked like it had flowed down
the side of the bed onto the floor; and blood was on the sheet, mattress, box
spring, and sheet covering the box spring.

The Tarrant County deputy medical examiner who
performed Chernay=s autopsy concluded that the
cause of Chernay=s death was blunt force injuries
with a stab wound to the buttock. 
Chernay=s body had thirty-four blunt
force trauma wounds and a stab wound to his right buttock, which the medical
examiner said were consistent with two different people striking with the same
weapon.  He explained that Chernay bled
to death from the buttock wound and that Chernay was unable to notice the
severity of the wound because he was

somewhat dazed . . . [or]
that the relative severity of the pain [from the blunt force injuries] was
possibly greater on [his] right side and therefore a stab wound to the buttock
might not have hurt as much.

 








The medical examiner also considered alternative
causes of Chernay=s death, including an accident
or a stun gun injury.   He testified,
however, that it was not possible that a stun gun caused Chernay=s death
because the injuries underneath the surface wound did not appear to be electrical
in nature.  He further stated that the
cause of Chernay=s death was homicide, and not an
accident, based upon the pattern of the wounds on Chernay=s body,
the crime scene itself, and the fact that no weapon was found at the scene that
was consistent with Chernay=s
injuries.

Dr. Randall Friese, a physician board certified
in general surgery and trauma critical care, also reviewed the autopsy report
and crime scene photographs.  He
testified that it was possible for a person to die from a stab wound in the
location in which Chernay was stabbed if he had lost a significant amount of
blood.  He also explained that regardless
of whether Chernay=s stab wound crossed a major
blood vessel, he could have lost a significant amount of blood because muscular
branches of arteries under arterial pressure can bleed vigorously.








Dr. Harry Bonnell, a forensic pathologist who had
been employed with the San Diego medical examiner=s
office, testified for the defense.  Dr.
Bonnell opined that the wound to the buttock could not have been the cause of
Chernay=s death
because the crime scene photos did not show that he lost enough blood.  Additionally, he did not believe that the
stab wound to the buttock was consistent with a knife wound; but rather, he
believed that the wound was caused by a jagged piece of bloody glass found on
Chernay=s bed,
on which Chernay could have fallen accidentally.  During cross-examination, however, Dr.
Bonnell stated that he had not looked at the wound itself and that he had not
seen how much blood had soaked into the mattress and carpet.

Dr. Bonnell also believed that Chernay had an
injury to the right side of his chest that was characteristic of a stun gun
injury.  He explained that a stun gun can
cause death if it applies high enough voltage to a certain area of the chest
when the heart is in a particular rhythm.








Whether viewed in a light most favorable to the
verdict,[22]
or in a neutral light,[23]
we conclude that there was sufficient evidence, including circumstantial
evidence and expert medical testimony, from which a rational fact-finder could
have found beyond a reasonable doubt that appellant murdered Chernay in this
case.[24]  The evidence presented by appellant to
support his alternative theories of the cause of Chernay=s death
is not so strong that ppellant=s guilt
cannot be proven beyond a reasonable doubt.[25]  Accordingly, because the evidence is legally
and factually sufficient to support the jury=s
verdict, we overrule appellant=s third
and fourth points.

In his fifth and sixth points, appellant asserts
that the trial court abused its discretion by permitting Dr. Friese to testify
as a medical expert regarding Chernay=s cause
of death because he does not have any experience in pathology.  He also contends that the trial court abused
its discretion in admitting Dr. Friese=s
testimony because his conclusions were based on possibility rather than Areasonable
medical probability.@

The question of whether a witness offered as an
expert possesses the required qualifications rests largely in the trial court's
discretion.[26]  Absent a clear abuse of that discretion, the
trial court's decision to admit or exclude testimony will not be disturbed.[27]


The test for admitting expert testimony is set
forth in rule 702:








If scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or education may testify
thereto in the form of an opinion or otherwise.[28]

 

The party proffering the expert witness bears the burden of showing
that the witness is qualified on the specific matter in question.[29]  No rigid formula exists for determining
whether a particular witness is qualified to testify as an expert.[30]  The special knowledge qualifying a particular
witness as an expert may be gleaned entirely from studying technical works,
obtaining a specialized education, practical experience, or a combination of
the three.[31]

An expert=s opinion
must be more than Asubjective belief or unsupported
speculation,@ but it need not reach the level
of Aknown to
a certainty@ to be admissible.[32]  An expert may testify in the form of an
opinion or inference.[33]








The record shows that Dr. Friese graduated from
medical school at the University of Maryland in 1990 and participated in a
seven-year residency at the University of Colorado, two years of which were a
fellowship in trauma research.  In 2001,
he came to Dallas to do a trauma critical care fellowship at Parkland
Hospital.  He is board certified in
general surgery and trauma critical care. 
At the time of trial, he was on the faculty at UT Southwestern Medical
School and Parkland as Assistant Professor of Surgery in the Division of Burn
Trauma Critical Care.

As a trauma surgeon, Dr. Friese is responsible
for the evaluation, diagnosis, and treatment of acutely injured patients.  His occupation has three parts: supervision,
practice, and research.  About half of
his time is spent in clinical practice at Parkland in the emergency room,
operating room, and surgical intensive care. 
Dr. Friese stated that he has treated over 500 stab wounds during his
practice.  He testified that he gives
opinions and makes decisions about cause of death in the hospital, although he
is not trained to give opinions about cause of death in a courtroom.








We hold that the trial court did not abuse its
discretion in finding that Dr. Friese was qualified to render expert testimony
on whether an individual could die from a stab wound described in the autopsy
report and shown in the crime scene photographs.[34]

Appellant further contends that the trial court
abused its discretion when it admitted Dr. Friese=s
testimony because his conclusions were based on possibility rather than Areasonable
medical probability.@ 
In support of this argument, appellant relies on civil case law, which
he contends requires that a physician=s
opinion testimony must be based upon Areasonable
medical probability.@[35]  His reliance on this authority, however, is
misplaced.  The court of criminal appeals
has specifically rejected the use of such language in criminal cases because it
improperly raises the State=s burden
of proof from proof beyond a reasonable doubt to proof beyond all doubt.[36]








The trial court did not abuse its discretion in
admitting Dr. Friese=s expert testimony.  We overrule appellant=s fifth
and sixth points.

In his seventh point, appellant asserts that the
trial court abused its discretion by admitting nine photographs showing the
numerous blunt force trauma injuries to Chernay=s face
and head, various angles of Chernay=s body
showing linear, paired abrasions, and the stab wound to Chernay=s
buttock taken by the medical examiner before and during Chernay=s
autopsy because they are more prejudicial than probative.  Specifically, he contends that a photograph
of Chernay=s head showing the underlying
soft tissue of Chernay=s skull after the skin was
reflected from the right side of his scalp lacks any probative value and likely
impressed the jury in an irrational way.








Admissibility of photographs is within the
discretion of the trial court.[37]  Rule 403 provides that even relevant evidence
may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice.[38]  Unfair prejudice refers to Aan undue
tendency to suggest decision on an improper basis such as an emotional one.@[39]  Rule 403 favors admissibility and contains a
presumption that relevant evidence will be more probative than prejudicial.[40]

While the photographs at issue are graphic, they
are highly probative regarding the cause of Chernay=s death
and appellant=s intent, and their prejudicial
effect, if any, is slight.  The State=s theory
of the cause of death was that Chernay was severely beaten over his entire body
and likely bled to death from a stab wound to the buttock because he was unable
to realize the severity of the wound. 
Appellant vigorously contested the conclusions of the State=s
witness and presented alternative theories regarding the cause of Chernay=s
death.  The photographs were highly
probative on the issue of how badly Chernay was beaten and were necessary to
show the full extent of his injuries. 
Under the circumstances of this case, we cannot say that the trial court
abused its discretion in admitting the photographs.  Therefore, we overrule appellant=s
seventh point.








Having
overruled all of appellant=s
points, we affirm the trial court=s
judgment.

 

JOHN CAYCE

CHIEF JUSTICE

 

PANEL A:  CAYCE, C.J.; HOLMAN
and WALKER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  December 7, 2006











[1]See Tex. R. App. P. 47.4.





[2]See U.S. Const. amend IV.





[3]Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997). 





[4]Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no
pet.).





[5]State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999).





[6]Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004, pet. ref=d).





[7]Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652‑53.





[8]Estrada, 154 S.W.3d at 607.





[9]Id.





[10]Armendariz v. State, 123 S.W.3d 401, 404
(Tex. Crim. App. 2003), cert. denied, 541 U.S. 974 (2004); Ross,
32 S.W.3d at 856; Romero, 800 S.W.2d at 543.





[11]See Illinois v. Gates, 462 U.S. 213, 236, 103
S. Ct. 2317, 2331 (1983);  Serrano v.
State, 123 S.W.3d 53, 58 (Tex. App.CAustin 2003, pet. ref=d).





[12]Bridges v. State, 574 S.W.2d 560, 562
(Tex. Crim. App. 1978).





[13]Green v. State, 799 S.W.2d 756, 757
(Tex. Crim. App. 1990).





[14]Bridges, 574 S.W.2d at 562. 





[15]Groh v. Ramirez, 540 U.S. 551, 558, 124
S. Ct. 1284, 1289-90 (2004); see also Long v. State, 132 S.W.3d 443, 448
(Tex. Crim. App. 2004) (stating that courts must look to the warrant and
affidavit together to determine whether the description of the place to be
searched is sufficient, and when courts make such a determination, they should Afollow a common sense and
practical approach[,] . . . not a[n] overly technical one@).





[16]Hankins v. State, 132 S.W.3d 380, 388
(Tex. Crim. App. 2004) cert. denied, 543 U.S. 944 (2004); Jones v. State,
833 S.W.2d 118, 123 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 921
(1993).





[17]Hankins, 132 S.W.3d at 388; Jones,
833 S.W.2d at 123.





[18]See U.S. Const. amend. IV; Long, 132 S.W.3d at 447-48.





[19]Long, 132 S.W.3d at 448
(quoting United States v. Heldt, 668 F.2d 1238, 1257 (D.C. Cir. 1981), cert.
denied, 456 U.S. 926 (1982)).





[20]See U.S. Const. amend. IV; Long, 132 S.W.3d at 447-48.





[21]See Long, 132 S.W.3d at 447-48; see
also Bridges, 574 S.W.2d at 562 (holding that a warrant sufficiently
described the place to be searched when there was no reasonable probability
that the officers were authorized to search any other place); Haynes v.
State, 475 S.W.2d 739, 741 (Tex. Crim. App. 1972) (stating that where the
warrant contains accurate directions as to how to locate the place to be
searched and a showing is made that the place searched is the place described,
the specificity requirement is met).





[22]See Ross v. State, 133 S.W.3d 618, 620
(Tex. Crim. App. 2004) (setting out the legal sufficiency standard of review).





[23]See Watson v. State, No. PD-469-05, 2006 WL
2956272, at * 8 (Tex. Crim. App. Oct. 18, 2006) (setting out the factual
sufficiency standard).





[24]The jury was instructed
that they could find appellant guilty of murder if, either as a coconspirator,
party, or individually, he (1) intentionally or knowingly caused Chernay=s death, (2) intended to
cause serious bodily injury and committed a dangerous act that caused Chernay=s death, or (3) committed
a felony and in its commission or flight from it, he committed an act clearly
dangerous to human life that caused Chernay=s death.  See
Tex. Penal Code Ann. '' 7.02, 19.02(b) (Vernon
2006).





[25]See Watson, 2006 WL 2956272, at *
8.





[26]Wyatt v. State, 23 S.W.3d 18, 28 (Tex.
Crim. App. 2000) cert. Denied, 127 S. Ct. 19 (2006).





[27]See id.; Penry v. State,
903 S.W.2d 715, 762 (Tex. Crim. App. 1995).





[28]Tex.
R. Evid.
702.





[29]Wyatt, 23 S.W.3d at 28; Penry,
903 S.W.2d at 762.





[30]Matson v. State, 819 S.W.2d 839, 851-52
n.10 (Tex. Crim. App. 1991).





[31]Holloway v. State, 613 S.W.2d 497, 501
(Tex. Crim. App. 1981); see also Carter v. State, 5 S.W.3d 316, 319-20
(Tex. App.CHouston [14th Dist.]
1999, pet. ref=d) (stating that an
expert witness may be qualified solely on the basis of practical experience).





[32]Daubert v. Merrell Dow
Pharm., Inc.,
509 U.S. 579, 590, 113 S. Ct. 2786, 2795 (1993); Grotti v. State, No.
02-04-406-CR, 2006 WL 3334331, at * 26 (Tex. App.CFort Worth Nov. 17, 2006,
no pet. h.).





[33]See Tex. R. Evid. 703; Vela v. State, 159 S.W.3d 172, 178
(Tex. App.CCorpus Christi 2004, pet.
granted).





[34]Although appellant
contends that Dr. Friese testified regarding Chernay=s cause of death, the
record reflects that Dr. Friese=s testimony before the jury was that it was Apossible for an
individual to die of a stab wound in that location and depth if a significant
amount of blood loss has occurred.@





[35]See Burroughs Wellcome
Co. v.
Crye, 907 S.W.2d 497, 500 (Tex. 1995); Duff v. Yelin, 721 S.W.2d
365, 370 (Tex. App.CHouston [1st. Dist.]
1986), aff=d, 751 S.W.2d 175 (Tex.
1988) (describing what level of medical testimony constitutes sufficient
evidence of causation); Boone v. United Founders Life Ins. Co., 565
S.W.2d 380, 381-82 (Tex. Civ. App.CFort Worth 1978, writ ref=d n.r.e.).





[36]See Crocker v. State, 573 S.W.2d 190, 207
(Tex. Crim. App. 1978)  (AWe disavow the language
in our opinion on original submission that addressed the sufficiency of the
evidence to prove causation in terms of >reasonable medical probability.=  That term has no role to play in the law of
burden of proof in criminal cases.@); see also Turro v. State, 950 S.W.2d
390, 397 (Tex. App.CFort Worth 1997, pet. ref=d) (stating that an
expert=s opinion about cause and
time of death does not have to eliminate all other possible causes of death).





[37]Rayford v. State, 125 S.W.3d 521, 529
(Tex. Crim. App. 2003), cert. denied, 543 U.S. 823 (2004).





[38]Tex.
R. Evid.
403; Rayford,
125 S.W.3d at 529.





[39]Newberry v. State, 135 S.W.3d 22, 43 (Tex.
Crim. App. 2004).





[40]Rayford, 125 S.W.3d at 529; Hayes
v. State, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).